# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: MARCH 23, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0418-MR

JOHN W. ALLENDER                                  APPELLANT

ON APPEAL FROM CAMPBELL CIRCUIT COURT
V.                 HONORABLE DANIEL ZALLA, JUDGE
NO. 17-CR-00588

COMMONWEALTH OF KENTUCKY                 APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING IN PART, REVERSING IN PART, AND REMANDING**

After a jury trial, John Allender was convicted by the Campbell Circuit Court of intentional murder and tampering with a witness. He was sentenced to life imprisonment. Allender now appeals his murder conviction as a matter of right, asserting errors at his trial in the admission of evidence, prosecutorial misconduct, and cumulative error. He also appeals his conviction for witness tampering on the basis that the trial court erred in failing to grant his motion for a directed verdict on that charge. Finding none of his contentions meritorious regarding his murder conviction, we affirm that conviction and sentence. However, we reverse and remand on the witness tampering charge as his motion for a directed verdict should have been granted.

## I. FACTUAL AND PROCEDURAL HISTORY

John and Cheryl Allender were married in 2008. However, by April 2017, their marriage had deteriorated and Allender had moved out of the family home into a separate living space which was attached to the family's garage (apartment). It was not a true apartment because it did not have a bathroom or kitchen and Allender continued to access the house to use its facilities. The couple was "giving one another space" and continuing to co-parent their children while preparing to divorce.

On April 18, 2017, Allender and Cheryl argued about when Allender would mow the lawn and whether Cheryl's father, who was also living on the property, would do it instead. Following the dispute, Allender returned to his apartment and locked the door. Cheryl followed him, unlocking the door and entering the apartment. Allender chased her out of the apartment, and Cheryl began screaming that she thought Allender was going to kill her.

Allender left the apartment and went to file a petition for an emergency protective order (EPO) against Cheryl. While he was gone, Cheryl texted him, inquiring about the location of their gas can so she could fill the lawn mower with gas. Allender did not respond to her message, but he returned home and went directly to his apartment. Cheryl then knocked on the apartment door several times.

From this point forward, the prosecution and defense presented different versions of the events that took place. Allender alleged in a statement he made to the police after the shooting that he was near his computer desk when

Cheryl entered the apartment uninvited with a pistol, a Sig Sauer that she owned, in her hand. He claimed he knew the Sig Sauer was loaded as he had borrowed it from Cheryl to take his girlfriend, Laura Hoeffer, out on Friday to practice shooting, and returned it to Cheryl on Sunday with it still loaded. According to Allender, Cheryl took four or five steps into the apartment, and then Allender pulled his holstered Smith and Wesson pistol and fired at her "center mass" several times in what he claims was an act of self-defense. Bullets hit Cheryl's head and upper body. Allender then called 911 and informed them that he had shot his wife in self-defense. Allender remained at the apartment, and when the police arrived, he informed them that he fired on Cheryl in self-defense when she entered the apartment with a gun.

The Commonwealth Attorney presented evidence of a deeply disturbed man who tormented his previous wives by taking out domestic violence orders against them, was cheating on his wife, was deteriorating at work and planned to set Cheryl up as the aggressor so that he could murder her and claim self-defense, rather than having to go through a divorce and divide their assets. The Commonwealth Attorney claimed that Cheryl entered the apartment unarmed after notice in search of the gas can so she could fill the lawnmower and Allender immediately shot her and then arranged the scene to claim self-defense.

The Commonwealth Attorney's theory was that Cheryl's supposed weapon was in fact Allender's gun which had remained in his possession after he took Hoeffer out shooting the prior weekend. The Commonwealth Attorney

3

presented expert witness testimony to establish that Cheryl had just entered the apartment and turned to the side when Allender shot her. The prosecution also played Allender's interview with the police after the shooting in which Allender indicated that when Cheryl entered his apartment, with the Sig Sauer, he immediately shot her. The Commonwealth Attorney alleged that Allender, who taught concealed carry weapon classes part time and was well-familiar with self-defense laws, had been planning and preparing for some time to kill Cheryl, and claiming self-defense was a component of his plan.

The Commonwealth Attorney called more than twenty witnesses and introduced hundreds of exhibits into evidence. Among the witnesses for the Commonwealth were Cheryl's friend Tracy Brewer-Lieber whom Cheryl had texted about problems within the marriage and Allender's behavior; Allender's girlfriend Hoeffer; Dave Capano to whom Allender boasted about knowing how to make a killing look like self-defense; Mark Miller who supervised Allender in his employment with the Internal Revenue Service (IRS) and who testified about Allender's troubling conduct at work; Detective Don Dornheggen of the Campbell County Police Department who took Allender's statement after the shooting; clerk Michelle Brown of the Campbell County Courthouse who assisted Allender with filing his EPO petition and testified about his behavior in conjunction with this filing; Officer Carl Harris who responded to a previous "rolling" domestic incident between Allender and Cheryl and interviewed both of them about the incident; Officer Brandon Vance with the Campbell County Crime Scene Unit; Kentucky State Police (KSP) firearms analyst Steven Hughes;

4

KSP Serologist Sara Lamb; KSP DNA analyst Bridget Holbrook; and crime scene reconstructionist Howard Ryan.

Various items were introduced into evidence by the Commonwealth Attorney, including numerous photos of the scene. Photos documented where bullets were located and that after Cheryl died, her body was found lying face down with her shoulders, neck and head sticking outside of the apartment doorway. Close up photos depicted that Cheryl's body had bullet wounds to her head and upper body; some photos showed these wounds bleeding from her prone body down the slope of the driveway. There were also photos after a post-mortem exam which showed Cheryl's body with metal rods threaded through her bullet wounds to show the entry and exit wounds; these showed that the bullets entered from her left side and exited through her right side. The Commonwealth Attorney also introduced Ryan's report which indicated he believed Cheryl was shot just after she entered the apartment, and he believed that Allender had planted the gun next to Cheryl.

Allender presented testimony from his own crime scene reconstructionist Jeremy Woods and introduced Woods's and Shelly Rice's joint report dated 2020. Woods testified that Allender's statements were not inconsistent with the scene. Woods also testified that damage to Cheryl's gun, the blood splatter pattern and debris on the gun was consistent with the Sig Sauer being held by Cheryl when Allender shot at her with his Smith and Wesson, with the damage to the Sig Sauer being caused by a round from the Smith and Wesson hitting it. Allender introduced his own pictures of the scene into evidence.

5

The trial court introduced three other crime scene reconstructionist reports into evidence which Allender had previously produced: a 2019 report from Woods and Rice; a different 2020 report from Woods and Rice; and a 2019 report from Rice.[1]

While awaiting trial, Allender's parents had custody of Allender's four children. Prior to trial, Allender made numerous phone calls to his parents from prison. During three of those calls, he inquired about whether one of his children, T.A., intended to testify at trial. He requested that his parents discourage T.A. and the other children from testifying. Based on these conversations, Allender was indicted for tampering with a witness. At trial, a recording of those conversations was played for the jury.

The jury found Allender guilty of both Cheryl's murder and tampering with a witness. The jury recommended a life-sentence for the murder charge and a consecutive five-year sentence for the witness tampering charge. On September 1, 2021, Allender's judgment and sentence were entered. The trial court imposed Allender's sentences concurrently.

---

[1] On May 28, 2021, the Commonwealth sought to exclude Woods from testifying and the then current report from being admitted into evidence, explaining that the reports kept changing on the eve of trial dates, it was misrepresented that only cover pages were changed when substantial changes were made making it appear Woods was the author of content previous to his involvement in the case and additional content was added at the last minute which substantively changed the content of the reports. The Commonwealth also sought to exclude Woods as an expert as he was substituted for Rice just before what was then the scheduled trial date. The trial court denied this motion, but apparently the introduction of all the reports for the jury to review was its solution to this dilemma.

## II. ANALYSIS

Allender challenges his conviction based on six alleged errors made by the trial court, the first three of which relate to the improper admission and exclusion of certain evidence. He also states the trial court erred by permitting prosecutorial misconduct, improperly denied his motion for of a directed verdict on the witness tampering charge, and cumulatively erred.

### A. Admission and Exclusion of Evidence

"An appellate court's standard of review for admission of evidence is whether the trial court abused its discretion." *Brewer v. Commonwealth*, 206 S.W.3d 313, 320 (Ky. 2006). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

### 1. Admission of Character Evidence

On September 23, 2020, the Commonwealth Attorney provided appropriate notice pursuant to the requirements of Kentucky Rules of Evidence (KRE) 404(c), that it planned to introduce KRE 404(b) evidence. As is relevant for this appeal, it sought to introduce evidence concerning: (1) Allender's poor work performance, which included that he missed work, his managers and coworkers were worried about his behavior and mental health, and he made threats and discussed bringing a gun to work; (2) Allender committing domestic violence in his prior marriages and seeking of prior orders of protection; (3) Allender's pursuit of sexual partners online and prior infidelity to Cheryl; and

7

(4) Allender randomly moving Cheryl's car. On March 1, 2021, Allender filed a motion *in limine* seeking to exclude this evidence. On April 17, 2021, the Commonwealth Attorney responded and provided additional support for why it thought this evidence should be admissible.

On June 3, 2021, the trial court ruled on all outstanding motions and as to these items concluded as follows: (1) the evidence of Allender's poor work performance, his absences and the concern of his managers and coworkers was relevant; (2) the evidence of domestic violence in Allender's previous marriages prior to the alleged action was admissible as evidence of preparation and plan; (3) the evidence as to Allender's pursuit of sexual partners, online dating activities and infidelity was not relevant or intertwined with relevant evidence, however it was permissible for the Commonwealth Attorney to refer to the fact that Allender had been unfaithful to Cheryl, this led to the demise of the marriage and Allender was dating someone else since his girlfriend Hoeffer would testify and his relationship with her was relevant; and (4) the evidence that Allender would randomly move Cheryl's car while she was at work was relevant and probative as it related to plan and motive.

Allender argues that the trial court erred in allowing the admission of improper character evidence regarding his pervasive prior bad acts in violation of the Kentucky Rules of Evidence (KRE) 404(b)(1) and (2), which substantially prejudiced him. He argues that pre-trial rulings erroneously allowed the admission of improper evidence, the Commonwealth Attorney exceeded the

limits set by that ruling, and then he was prejudiced when extensive evidence was used at trial to establish his poor character.

KRE 404(b), which concerns character evidence regarding "other crimes, wrongs, or acts[,]" provides as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
>
> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
>
> (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

Of note, "the list provided in KRE 404(b)(1) is illustrative rather than exhaustive." *Kelly v. Commonwealth*, 655 S.W.3d 154, 165 (Ky. 2022).

"In order to determine if other bad acts evidence is admissible, the trial court should use a three-prong test: (1) Is the evidence relevant? (2) Does it have probative value? (3) Is its probative value substantially outweighed by its prejudicial effect?" *Leach v. Commonwealth*, 571 S.W.3d 550, 554 (Ky. 2019). "[A]fter determining relevancy and probativeness, the trial court must weigh the prejudicial nature of the 'other bad acts' evidence versus its probative value. Only if the potential for undue prejudice substantially outweighs the probative value of the evidence must it be excluded." *Id.* "The prejudice must go beyond that which is merely detrimental to a party's case and be of such character that it 'produces an emotional response that inflames the passions of the triers of fact or is used for an improper purpose.'" *Kelly*, 655 S.W.3d at 165 (quoting

9

Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.25[3][d], at 135 (4th ed. 2003)). Such evidence "is, of course, prejudicial to [the defendant] as all evidence of culpability is in a criminal proceeding" but is still properly admissible so long as it is not "*unduly* prejudicial because it is not unnecessary or unreasonable." *Luna v. Commonwealth*, 460 S.W.3d 851, 873 (Ky. 2015) (footnote omitted).

In this case Allender's intent was a central issue because the Commonwealth Attorney was endeavoring to prove that he had the intent to cause death to Cheryl while Allender was endeavoring to prove that in shooting Cheryl, his intent was to protect himself. When a defendant's mental state is disputed, prior bad act evidence is admissible to prove whether the defendant had the needed mental state to commit the crime. *Walker v. Commonwealth*, 52 S.W.3d 533, 536 (Ky. 2001). Therefore, any evidence which could contribute to resolving which intent was more likely was relevant and probative. Similarly, evidence regarding other KRE 404(b)(1) purposes, such as to establish motive, plan and absence of mistake, was relevant and probative. Accordingly, our discussion will focus on whether the evidence admitted was more prejudicial than probative, and if so, whether its admission was harmless.

As to whether errors are harmless:

> As a general rule, the erroneous admission of evidence in violation of state law is not a federal constitutional error. And, as the Supreme Court of the United States noted in *United States v. Hasting,* 461 U.S. 499, 509, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983):
>
>> Since *Chapman* [*v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ], the Court has consistently made clear

10

that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations.... The goal, as Chief Justice Traynor of the Supreme Court of California has noted, is "to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without becoming mired in harmless error."

(Internal citations omitted)[.]

*Meece v. Commonwealth*, 348 S.W.3d 627, 664 (Ky. 2011).

Criminal Rule 9.24 states that "no error in either the admission or the exclusion of evidence" will warrant reversal unless the "denial of such relief would be inconsistent with substantial justice." The harmless error inquiry "is not simply 'whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.' " *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 (Ky.2009) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)) (alteration in original).

*Elery v. Commonwealth*, 368 S.W.3d 78, 85 (Ky. 2012) (footnote omitted).

Therefore, if we conclude that evidentiary errors occurred, reversal is not warranted if they are harmless.

### a. The trial court partially erred in admitting excessive evidence regarding Allender's poor work performance including absenteeism, and concerns about his mental health, but did not err in admitting evidence about the threats he made which were connected to Cheryl.—Preserved

At trial, a part of the Commonwealth Attorney's theory of the case was that Allender's mental health was steadily declining, and that decline culminated with Cheryl's murder. However, it appears that no expert witnesses testified to this decline. Instead, to show such decline, the

11

Commonwealth Attorney wished to present testimony from Miller, Allender's supervisor at the IRS.

In its response to Allender's motion to exclude this evidence, the Commonwealth Attorney argued that Allender's issues at work were indicative of his escalating aggression and deteriorating mental state leading up to Cheryl's murder. The Commonwealth Attorney claimed that Allender's hostile comments about Cheryl tended to disprove that he acted in self-defense and instead demonstrated his aggressive state of mind and animosity toward Cheryl. The trial court ruled the evidence of Allender's poor work performance, his absences and the concern of his managers and coworkers was relevant and allowed for its admission.

Miller testified that three months prior to Cheryl's death, issues began to arise with Allender at work, including late arrivals, inattention, frequent conversations with co-workers about problems at home, and failure to show up for a scheduled shift. According to Miller, approximately a month before Cheryl's death, Allender was upset and agitated at work one day and told a co-worker that he wished he was dead. After this comment, Allender was referred to an employee-assistance problem, was interviewed by the company's internal police agency, and local police were called to perform a welfare check on Allender. When Allender continued to have issues, he was asked to meet with Miller privately. Miller expressed concern and suggested an intervention, and Allender responded, "I know what to do with my wife, and I know what to do

12

with you." Allender's union president also informed Miller that Allender had said that he wanted to bring a gun onto the premises.

Officer Vance also read Allender's texts about how he was having trouble at work into evidence. This was justified as it was providing Allender's side of the story.

The evidence regarding Allender's problems at work is admissible for one of the appropriate KRE 404(b)(1) purposes if it is more probative than prejudicial. Specifically, the joint threat Allender made against both Cheryl and Miller a week before Cheryl was killed was applicable to Allender's motive, intent and the absence of mistake. Allender admits that this threat was admissible but argues that everything else that came in about his work problems was not. While we agree the threat evidence was properly admitted, we discuss this further as a joint threat against the victim (who was killed) and a third party (who was never acted against) presents a novel issue as to whether the threat against each is properly admissible and whether the threat against Miller himself is admissible is pertinent in determining whether the other evidence about Allender's work problems was also properly admissible.

Threats against the same victim are generally admissible to prove state of mind of the defendant at the time of the crime, as are threats against no one in particular as they can show general malice, which was then directed at the victim, while specific threats against a third parties are generally inadmissible. *Sherroan v. Commonwealth*, 142 S.W.3d 7, 18 (Ky. 2004). However, "[a]n exception [to that last category] has been recognized when the threat against

13

the third person is so close in time to the charged offense as to be considered a part of the same transaction. *Id.*

In *Sherroan*, a threat made against a social worker within hours of murdering others was ruled to be admissible as to the defendant's state of mind. *Id.* at 19. Certainly, that is closer in time to the threat made against Miller a week before Cheryl was killed, but unlike with the social worker, the threats against Cheryl and Miller were made in conjunction with one another. Allender's threatening statement and Allender's expressed desire to bring a gun into work shortly thereafter, were highly relevant to show he had a plan to address his problems with violence. Under these circumstances, both threats and the coupling of the threats with the desire to bring a gun into work needed to come in as they were entwined and highly probative of Allender's intent and plan to address his difficulties (both work and marital) with violence.

As to the other evidence regarding Allender's work conduct, without an expert witness to establish that it was significant to show his mental deterioration and explain how that connected to Allender choosing to kill Cheryl, this evidence was more prejudicial than probative. However, although this evidence was improperly admitted in large part, it was appropriate to introduce a portion of it to provide a basic explanation as to why Allender was upset with Miller and why Miller took the threat seriously. It would then have been up to Allender how much he wanted to explore this issue further on cross-examination. Given the strength and importance of the threat evidence,

14

the other evidence about Allender's general work problems was vastly overshadowed. Had such evidence come in without there also being a threat issued, and without all the other evidence regarding Allender's conduct toward Cheryl and the crime scene evidence, the work evidence could be viewed as much more prejudicial. Therefore, while the detailed testimony by Miller about Allender's poor work performance was more prejudicial than probative, and in another closer case could have provided ample reason for reversal, given the entire evidence presented in the case, we determine it was harmless because it could not have a substantial effect on the outcome of the case.

### b. While the trial court erred in admitting evidence regarding Allender committing domestic violence against and seeking prior orders of protection regarding his prior wives, this error was harmless.—Preserved

Allender sought to exclude evidence regarding his treatment of his former wives, specifically that he committed domestic violence against them and sought protective orders against them as improper evidence of prior bad acts. The trial court initially declined to exclude such evidence, determining it was admissible as evidence of preparation and plan.

During the trial, this evidence came up regarding the "rolling" domestic incident, Allender seeking an order of protection against Cheryl, and Allender's statement to the police after Cheryl was killed. As to the "rolling" domestic incident, an event which occurred months prior to Cheryl's death, both Cheryl and Allender separately called the police and Officer Harris responded. At trial, Officer Harris testified and Cheryl's video statement to the officer was played for the jury. According to this material, Allender and Cheryl both told the

15

police about prior incidents of domestic violence and issuance of DVOs involving Allender and his ex-wives.

Brown, the Campbell County Deputy Circuit Clerk who assisted Allender in filing for an order of protection against Cheryl on April 18, 2017, the very same day he killed Cheryl, testified that Allender specifically denied ever seeking an order of protection before. When Brown looked this up, she found that this was incorrect.

Finally, when Det. Don Dornhagen interviewed Allender the day after he killed Cheryl, Allender admitted he had committed domestic violence before and been charged with fourth-degree assault against his prior wife in 1999.

It was after this evidence had come in that Allender objected to the Commonwealth Attorney seeking to admit a document establishing Allender's divorce from one of his former wives. The Commonwealth Attorney apparently was seeking admission of this document as preparatory evidence into establishing prior DVOs or domestic violence between Allender and that prior wife.

The trial court during a bench conference announced it had decided to revisit this issue of admitting evidence of domestic violence. The trial court after asking when these prior incidents of domestic violence took place, ultimately sustained the defense objection to further reference to domestic violence as this was not intertwined with the ultimate issue and the prior orders (in 2000 and 2007) were too remote in time. However, Allender did not

16

request an admonition regarding the prior evidence of domestic violence that had earlier been presented to the jury.

> Generally, evidence of prior threats and animosity of the defendant against the victim is admissible as evidence of motive, intent or identity, *e.g., Goodman v. Commonwealth,* Ky., 285 S.W.2d 146, 149 (1955), whereas evidence of prior threats or violence against an unrelated third-party is generally regarded as inadmissible character evidence, *e.g., Fugate v. Commonwealth,* 202 Ky. 509, 260 S.W. 338, 341 (1924).

*Davis v. Commonwealth,* 147 S.W.3d 709, 722 (Ky. 2004).

Very similar acts committed against third parties, especially if recent, can be admissible to show plan and absence of mistake. *See Kelly,* 655 S.W.3d at165–66 (allowing in evidence of substantially similar behavior toward an unrelated third party fifteen days earlier, unlawful imprisonment, as being probative of the defendant's mental state, his intent to commit unlawful imprisonment against the victim). However, old acts even if similar, may be too attenuated to be admissible. *See Driver v. Commonwealth,* 361 S.W.3d 877, 886 (Ky. 2012) (explaining defendant's prior violent actions against his former wife twelve years earlier were too remote to be properly admissible in the prosecution for violent acts against his current wife but determining admitting such evidence was harmless).

While Allender had not killed or attempted to kill his previous wives, his prior actions of being the aggressor, acting out violently, and then seeking to employ the domestic violence statutes to paint himself as the victim, were relevant and probative, but not more probative than prejudicial in determining intent. While Allender's actions against his previous wives could be evidence of

a plan to hurt Cheryl, discredit her and blame her for his actions and his previous conduct could also be admissible to demonstrate absence of mistake or accident, this evidence was simply too outdated and under those circumstances risked being given more weight than it was worth. It also risked inflaming the passions of the jurors. *Kelly*, 655 S.W.3d at 166. Additionally, this evidence was not inextricably entwined with other evidence essential to the case even if it was mentioned when the police investigated the "rolling" domestic incident, learned about when Allender applied for an EPO against Cheryl, and admitted to by Allender when he gave his statement following Cheryl's death.

However, this does not conclude our inquiry as we must examine whether the error in admitting such evidence was nevertheless harmless. There was substantial evidence regarding Allender's intent to murder Cheryl based on his previous threat, his previous conduct toward Cheryl earlier and his actions up to the day she was killed. Furthermore, Cheryl's understanding that Allender had previously committed domestic violence against his former wives was relevant to her perception that he posed a threat toward her. Given the limited nature of the evidence presented to the jury regarding Allender's conduct toward his former wives—which was provided in the context of admissions against interest he made in conjunction with his statements to police regarding the two incidents regarding Cheryl—we are confident that this evidence although improper had limited impact and did not influence the jury's verdict. Accordingly, the admission of this evidence was harmless.

18

### c. The trial court partially erred in admitting evidence regarding Allender's extensive pursuit of other sexual partners and prior infidelity to Cheryl beyond what had previously been sanctioned.— Preserved

Prior to trial, the Commonwealth Attorney filed a notice that it intended to introduce at trial "[e]vidence related to [Allender's] extensive pursuit of sexual partners through online dating websites and his prior infidelity to the victim." Allender moved to exclude such evidence and testimony as irrelevant to the crimes charged.

The trial court ruled that evidence as to Allender's pursuit of sexual partners, online dating activities and infidelity was not relevant or intertwined with relevant evidence, however it was permissible for the Commonwealth Attorney to refer to the fact that Allender had been unfaithful to Cheryl, this led to the demise of the marriage and Allender was dating someone else who was going to testify.

During trial, more evidence of marital infidelity came in than perhaps Allender believed to be warranted given the trial court's prior ruling. For example, testimony was given about Allender's relationship with his girlfriend, text messages were admitted in which Cheryl discussed his infidelity, testimony was given about the erotica found on Allender's phone, and there was testimony about Allender messaging with a number of women and telling them that he was divorced. Apparently as trial strategy, Allender failed to object contemporaneously to such evidence as violating the trial court's prior ruling. On appeal he argues that such evidence inflamed the jury and was highly prejudicial.

19

As explained in *Springer v. Commonwealth*, 998 S.W.2d 439, 449 (Ky. 1999), KRE 404(b)(1) has no application to evidence about infidelity:

> [KRE 404(b)(1)] proscribes the introduction of evidence tending to prove a particular character trait "in order to show action in conformity therewith." Evidence of immorality would not tend to prove a propensity or predisposition to commit homicide. Thus, the evidence must be tested by the general rule of relevancy, *i.e.*, whether it has "any tendency to make the existence of *any fact that is of consequence to the determination of the action* more probable or less probable than it would be without the evidence." KRE 401. (Emphasis added.) A "fact that is of consequence to the determination of the action" includes not only a fact tending to prove an element of the offense, but also a fact tending to disprove a defense. Relevancy is established by any showing of probativeness, however slight.

*Id.*

Whether evidence of marital infidelity is relevant will depend upon the particular facts of the case. "[E]vidence of marital infidelity which lacks legitimate connection to the crime charged amounts to an attack upon the defendant's character and results in prejudicial error." *Smith v. Commonwealth*, 904 S.W.2d 220, 222 (Ky. 1995). However, marital infidelity can be relevant if connected to the crime charged and relevant to establish motive. *Chumbler v. Commonwealth*, 905 S.W.2d 488, 493 (Ky. 1995). "Evidence that a defendant was romantically involved with another person is relevant to establish a motive to kill that defendant's spouse." *Springer*, 998 S.W.2d at 450.

The Allenders planned to divorce because Cheryl was unwilling to tolerate Allender's infidelity. A limited amount of evidence regarding his infidelity was needed, as the trial court previously ruled, to explain the

20

breakdown of the marriage and why he was engaging in target practice with his girlfriend. While additional information about Allender's infidelity was generally relevant as it provided a possible motive to kill Cheryl so that he could freely pursue other relationships and encounters, such motive was lessened by the fact that Cheryl and other people already knew Allender was unfaithful, he was already engaging in such relationships and encounters, Allender could escape the marriage through a planned divorce, and he was not seeking to escape the marriage to be with a specific alternative love-interest. Thus, to the extent that evidence came in about his infidelity beyond what was needed to explain the breakdown of the marriage and why he was with his girlfriend, it was improper character evidence. Therefore, allowing the Commonwealth Attorney to explore the issue of Allender's infidelity further afield of what the trial court previously ruled was admissible was in error. Certainly, information about what Allender had on his phone and his sexual escapades shortly before Cheryl was killed was more prejudicial than probative as it was of extremely limited relevance under the circumstances and showed him as an immoral individual. However, in the context of the whole trial and the substantial evidence supporting the verdict, we are confident that such testimony was harmless and did not influence the verdict. We caution the Commonwealth Attorney not to exceed the bounds specified by a previous court order and that in another case such evidence could be grounds for reversal.

### d. The trial court did not err in admitting evidence that Allender moved Cheryl's car.—Preserved

Prior to trial, the Commonwealth Attorney filed a notice that it intended to introduce at trial evidence that Allender would come to Cheryl's workplace and move her car from one parking spot to another while she was working. Allender moved to exclude such evidence, arguing that this allegation was unproven and irrelevant to the charges against him. The trial court ruled that evidence that Allender would randomly move Cheryl's car while she was at work was relevant and probative as it related to plan and motive.

Generally, evidence that a defendant previously acted with "animosity . . . against the victim is admissible as evidence of motive, intent or identity[.]" *Davis v. Commonwealth*, 147 S.W.3d 709, 722 (Ky. 2004). Additionally, the victim's mental state can be "relevant to prove the increasingly strained relations between [the victim and the appellant], tending to show a motive for murder, KRE 404(b)(1)," thus refuting alternate claims for how the victim's death occurred. *Ernst v. Commonwealth*, 160 S.W.3d 744, 754 (Ky. 2005) *overruled on other grounds by Mason v. Commonwealth, 559 S.W.3d 337, 341-42 (Ky. 2018)*. Additionally, individual actions against a victim can also be admissible where they are part of a larger plan to get away with murder. *Id.* at 760.

In this case Allender moving Cheryl's car could be indicative of Allender's plan and motive, as such actions could show that he meant to upset Cheryl and to make her and other people question her rationality, thus setting her up to appear to be the aggressor so that when he shot her, he could claim self-

22

defense. Cheryl's belief that Allender was "messing with her" by moving her car, could also show their strained relations, which is relevant for motive. While Allender objects that the fact that he moved her car cannot be objectively established, it was appropriate for the jury to hear this evidence and decide for itself whether it should be believed and what weight to give it. As the evidence was relevant and more probative than prejudicial, it was properly admissible

## 2. The trial court did not err in admitting to Cheryl's video statement from the "rolling" domestic incident.—Preserved

Allender argues that the admission of Cheryl's video statement from the "rolling" domestic incident violated KRE 601 and KRE 403. We previously discussed Cheryl's statement in the context of whether her reference to Allender's previous incidents of domestic violence constituted improper character evidence.

On June 17, 2016, Allender and Cheryl were traveling in a car together when a dispute occurred between them. Allender eventually stopped the car and let Cheryl out on the side of the road. Both Allender and Cheryl placed 911 calls to report the dispute. Officer Carl Harris responded to the calls and interviewed Allender and Cheryl separately. In her recorded interview, Cheryl alleged that Allender was going crazy, driving recklessly and that she was trying to get out of the truck. In Allender's interview, which was summarized by Officer Harris who testified regarding what he recalled Allender said occurred, Allender alleged that Cheryl was depressed and dehydrated, had tried to jump out of the vehicle, kicked his leg and tried to push his leg down on the gas pedal, and that he felt compelled to call 911 because he had been on

23

the wrong side of prior accusations of domestic violence before. Officer Harris noted that he photographed the rubber or dirt on Allender's leg where Cheryl allegedly kicked him, but there was no visible injury to his leg. No charges were filed against either of them.

While both interviews were recorded by Officer Harris's body camera, unfortunately, both videos had not been preserved. Per department policy, body-camera videos are stored by the department for a length of time determined by the seriousness of the charge related to the video. Because no charges were brought against either Allender or Cheryl, both videos should have been labeled "routine" and stored for 90 days, after which they would be automatically deleted. The video of Allender's interview was labeled "routine" and was thus automatically deleted after 90 days. However, the video of Cheryl's interview was labeled "misdemeanor," and thus it was not automatically deleted.

On February 4, 2019, Allender filed a motion to exclude this video from evidence, claiming it was inadmissible under KRE 106 and KRE 403, because only the video of Cheryl's interview was available, while Allender's was not. He argued that because his video was unavailable, Cheryl's should not be introduced, reasoning "providing the jury with a partial picture [of the domestic dispute] creates an unduly prejudicial situation and is inherently misleading" as it gives a "skewed partial picture" of "limited probative value and excessive prejudice." He also sought to prohibit all discussion of the domestic argument that took place then.

24

On September 28, 2020, the Commonwealth Attorney responded and opposed the exclusion of Cheryl's video statement and testimony about the incident. The Commonwealth Attorney explained that while Allender's video statement had indeed been lost, due to his statement being labeled as routine and being auto-deleted, this did not justify excluding Cheryl's statement under the rule of completeness as KRE 106 is a rule of completeness and not exclusion, relying on *Soto v. Commonwealth,* 139 S.W.3d 827, 865-66 (Ky. 2004).

In an order entered on March 8, 2021, the trial court resolved this matter, agreeing with the Commonwealth that pursuant to *Soto*, the fact that a portion of the video was deleted due to a coding error does not require the exclusion of the remaining relevant portion of the videotape pursuant to KRE 106.

KRE 106 provides as follows: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."

In *Soto*, the appellant who was convicted of murder and had been writing a "story" related to it, had page forty-three of this story admitted against him. The first thirteen pages of the story were missing. He sought to exclude introduction of this page as violating the rule of completeness because the first thirteen pages of his "story" were missing and could not be introduced. *Soto,*

25

139 S.W.3d at 865.  In rejecting this interpretation of the rule our Court explained:

> KRE 106 is a rule of admission, not exclusion. It allows a party to introduce the remainder of a statement offered by an adverse party for the purpose of putting the statement in its proper context and avoiding a misleading impression from an incomplete document. [Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 1.20 (3rd ed.1993)] ("The objective of [KRE 106], in other words, is to prevent a misleading impression as a result of an incomplete reproduction of a statement or document."). It does not require the exclusion of a relevant portion of a document because other portions cannot be found.

*Id.* at 865–66.  *Compare Commonwealth v. Stone*, 291 S.W.3d 696, 703 (Ky. 2009) (explaining that where a redacted statement did not create a false impression, the defendant had no right to require the balance of his statement be admitted; if dissatisfied, he "was free to testify at trial and fully present the facts as he understood them to be") *with Sykes v. Commonwealth*, 453 S.W.3d 722, 726-27 (Ky. 2015) (providing an example of when omitted portions of statements are needed to correct a false impression as to the defendant's state of mind).

We agree that had Allender's recorded statement been available, that it would have been appropriate to introduce it as well.  However, as it was not available, this does not justify excluding Cheryl's statement.  Cheryl's statement was whole, so there was no remaining portion of her statement that needed to be introduced as would change the interpretation to be given to what was introduced.  The absence of Allender's statement does not make Cheryl's statement about her interpretation of what occurred misleading.

26

Police do not always interview and record every party's statement regarding what appears to be a possible domestic violence incident, nor are they obligated to do so. Potential aggressors may also choose not to participate in interviews. Therefore, the lack of a statement from one party to such an incident really has no bearing on whether another statement should be introduced.

Regarding Allender's statement, Allender was appropriately allowed to have his position represented by the officer testifying who was able to summarize it. If unhappy with his recitation, Allender had the option of testifying. Just because he chose not to testify, does not preclude Cheryl's statement from being introduced. Additionally, the jury was informed of why the videotape of Allender's statement was unavailable.

Finally, Cheryl's statement was highly relevant. As explained in *Dillon v. Commonwealth*, 475 S.W.3d 1, 23 (Ky. 2015), "when a defendant claims self-defense or accident . . . , the victim's fear of the defendant becomes an issue in the case, and evidence of that state of mind is relevant." The admission of Cheryl's recorded statement allowed the jury the opportunity to see that Cheryl was afraid of Allender before he killed her, thus providing evidence to counteract Allender's claim that in fact Allender was afraid of Cheryl and acted in self-defense. Therefore, the trial court acted appropriately in allowing the Commonwealth Attorney to introduce Cheryl's recorded statement into evidence. It was up to the jury to evaluate, based on the evidence it had before it, what may have happened during this incident and

27

whether this supported the Commonwealth Attorney's or defense's theory of the case.

### 3. *The trial court did not err in excluding evidence of Cheryl's Blood Alcohol Concentration (BAC)*

Allender next argues that the trial court erred by excluding evidence regarding Cheryl's BAC.

In conjunction with Cheryl's autopsy, a toxicology report and blood-alcohol level report were prepared. These reports showed that Cheryl's blood-alcohol level was .045% at the time of her death. The Commonwealth Attorney moved to exclude these reports from evidence, claiming that the reports bore no relevance to the question of whether Allender was justified in shooting his wife. In response, Allender argued that failure to admit the evidence would deprive him of the ability to present a complete and meaningful defense. He reasoned that evidence proving that Cheryl was drinking on the day of her death related to her behavior on that day and her mental state at the time of her death.

On March 25, 2021, the Commonwealth Attorney moved to exclude evidence of Cheryl's toxicology results as irrelevant and lacking proper support for admission. It argued that her .045% value for alcohol was less than half the legal limit and not probative for her behavior as Allender per his own statement shot her immediately before he would have had any time to observe whether she was intoxicated or not, Allender had not disclosed that he planned to have any toxicologist testify, chain of custody could not be established and use of this evidence would be speculative.

On June 1, 2021, Allender filed a motion to compel the release of Cheryl's toxicology report as necessary to his defense, arguing in part:

> Evidence of her blood-alcohol content constitutes a link in the chain of proof of the behavior and mental state that led her to enter her estranged husband's separate apartment with a loaded gun. Prohibiting all testimony regarding her toxicology does not just mislead the jury, it keeps the jury completely in the dark as to the true facts of significant consequence, specifically facts that could point to Cheryl Allender being the initial aggressor in defendant's claim of self-defense.

The Commonwealth Attorney continued to oppose its admission on the basis that Allender was attempting to use this test to establish Cheryl's behavior as erratic and that she was a drunken aggressor just because she consumed alcohol, which was the height of speculation without an expert to establish the effects of that level of blood alcohol. It also stated that no one who was testifying could establish the chain of custody for the sample.

On June 3, 2021, the trial court orally ruled that it would prohibit evidence regarding Cheryl's toxicology report because it was not relevant standing alone. The trial court explained that there had to be more evidence about how such toxicology was affecting the victim in her mannerisms or conduct, with the self-defense claim having to be related to such conduct. Additionally, there had to be expert testimony as to how Cheryl's conduct was affecting the defendant at the time of the alleged offense.

Not all relevant evidence is admissible. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative

29

evidence." KRE 403. "'Confusion of the issues' is generally used to exclude evidence that creates side issues that distract jurors from the real issues of the case." *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 715 (Ky. 2009). "'Misleading the jury' refers primarily to the possibility of the jury overvaluing the probative value of a particular item of evidence for reasons other than the emotional reaction associated with unfair prejudice." *Id.*

"When considering whether to reject relevant evidence under KRE 403, a trial court must consider three factors: the probative worth of the evidence, the probability that the evidence will cause undue prejudice, and whether the harmful effects substantially outweigh the probative worth." *Huddleston v. Commonwealth*, 542 S.W.3d 237, 245 (Ky. 2018). "[W]here the value of evidence for a legitimate purpose is slight and the jury's probable misuse of the evidence for an incompetent purpose is great, the evidence may be excluded altogether." *Nugent v. Commonwealth*, 639 S.W.2d 761, 764 (Ky. 1982).

While Allender seeks to establish that Cheryl's use of alcohol was relevant and highly probative of her being the aggressor, his statements to the police did not indicate that he knew, believed, or suspected her to be intoxicated and feared her as a result, so this cannot justify his actions. Additionally, the blood testing revealed a blood alcohol level much lower than legal intoxication for purposes of driving, so on the face of it, it appears to be less relevant than a higher level would be. Without an expert witness to testify about Cheryl's blood alcohol level and what impact it could have on her behavior, allowing evidence that she consumed alcohol before she was killed

30

would have invited speculation and likely led to the jury giving this evidence more weight than it deserved. There was also no lay testimony that Cheryl was suspected or known to have drunk alcohol that day, or what her behavior was like when she drank alcohol.

From the evidence presented, Allender had no reason to think Cheryl had consumed any alcohol or would be aggressive as a result and, thus, information about her intoxication that he learned after-the-fact, was of limited probative value as it had no effect whatsoever on his conduct. He knew that she drank alcohol some evenings but had no reason to believe she would have drunken alcohol earlier in the day. Under these circumstances, while evidence that Cheryl drank alcohol prior to allegedly confronting Allender with a gun could have some limited probative value in explaining why she might have entered his apartment with a gun, it was outweighed by the risk that such evidence would be prejudicial without an expert to put it into proper context.[2] Therefore, there was no abuse of discretion in the trial court declining to allow this evidence to be disclosed under these circumstances.

---

[2] For further examination of the issue as to whether such evidence should be admitted so that a defendant can claim self-defense, see generally *Durrett v. Commonwealth of Kentucky*, 2014-SC-000177-MR, 2015 WL 4979723, at \*3–6 (Ky. Aug. 20, 2015). Although *Durrett* is distinguishable in many respects with the factual scenario before us, and not authoritative as an unpublished opinion, we do agree with its reasoning that such evidence, although relevant, is attenuated where the defendant claiming self-defense did not claim to know by the victim's behavior that the victim was intoxicated (and thus a threat for that reason) prior to shooting the victim. *Id.* at \*5-6.

31

**B. The trial court erred in permitting the Commonwealth Attorney to make an inappropriate statement in closing argument, but this error was not flagrant and did not result in manifest injustice.—No objection/unpreserved**

Allender argues that the Commonwealth Attorney committed flagrant errors in its closing argument by telling the jury: (1) Cheryl, through the interview involving the "rolling" domestic incident, told the jury that there had been domestic violence in Allender's prior marriages and that she was telling the truth about this, when this should have been excluded because the Commonwealth Attorney knew that the trial court had restricted the Commonwealth from providing testimony about prior EPOs/DVOs; (2) no one had put a gun in Cheryl's hands ever, at any point in her life except her murderer, there was no evidence she had ever possessed a gun, and the only suggestion that Cheryl owned the gun came from Allender, when this was factually incorrect based on evidence that had come in at trial from Brewer-Lieber's testimony that Cheryl told her that Cheryl and Allender would target practice together and Lt. Nick Love testified that Cheryl had a pistol in a box in the storage room in her house.

In reviewing claims of prosecutorial misconduct, an appellate court focuses on the overall fairness of the trial, reversing only if the misconduct was "so improper, prejudicial, and egregious as to have undermined the overall fairness of the proceedings." *Brewer*, 206 S.W.3d at 349. It is well established that a prosecutor "has wide latitude while making opening or closing statements." *Id.* The prosecutor may properly "present to the jury not only the facts brought out in the evidence, but may deduce therefrom all legitimate

32

conclusions" as opposed to making up facts. *Jackson v. Commonwealth*, 301 Ky. 562, 566, 192 S.W.2d 480, 482 (1946).

Because Allender did not object, he must both show that the objectionable comments were flagrant and that he suffered manifest injustice as a result. *See Matheney v. Commonwealth*, 191 S.W.3d 599, 606 (Ky. 2006) ("Because Appellant did not object at trial, we need only evaluate whether the prosecutor's misstatement was 'flagrant.'"); Kentucky Rules of Criminal Procedure (RCr) 10.26 (providing relief from palpable error only if it constitutes "manifest injustice").

As to the Commonwealth Attorney referring to evidence that had been admitted regarding Allender's previous incidents of domestic violence regarding his former wives, it was improper for the Commonwealth Attorney to discuss this evidence in the manner done. The Commonwealth Attorney, by claiming that it was true there had been domestic violence in Allender's prior marriages, presented a fact not in evidence. Cheryl had no personal knowledge of what had occurred in Allender's prior marriages but what other people had told her, and the Commonwealth Attorney had been precluded by proving that there had been prior domestic violence (and DVOs) in Allender's prior marriages. Also, Allender had made statements against interest admitting that he had at least been accused of domestic violence previously. Clearly then, this statement was referring to what the Commonwealth Attorney planned to introduce to which Allender objected. There was no actual proof that Allender had committed previous incidents of domestic violence, as such evidence was excluded from

33

being introduced when the trial court determined these incidents were too remote. In another case, this unsupported statement in a closing argument could have resulted in reversible error, but this argument was not repeated and some of the prior evidence that had come in regarding these topics was intwined with Chery's and Allender's prior statements, with Allender admitting to such conduct in his statements, this is not a serious enough error to warrant a new trial.

As to the Commonwealth Attorney inferring that Allender was the only one to put a gun in Cheryl's hand, this could be consistent with her engaging in target practice with Allender at his urging and having a gun in a box in her home because Allender put it there when he also occupied the house. It was also consistent with the evidence that Allender may have planted a gun in Cheryl's hand to justify the shooting as self-defense. Contrary inferences were also supported by the available evidence. Obviously, Allender would have preferred that the jury to conclude from this same evidence that Cheryl was well familiar with how to use a gun, owned the pistol found by her body and owned the gun in the box that was found in her house, and that Cheryl was the aggressor when she entered Allender's apartment, but the Commonwealth Attorney's inferences were properly supported by its interpretation of the evidence.

## C. The trial court erred in denying Allender's motion for a directed verdict on the witness tampering charge.—Directed verdict not properly requested

The basis for the witness tampering charge were three recorded phone calls between Allender and his parents, who had custody of his children. As Allender was in jail, he had previously received notice that any calls he made from jail would be recorded.

Allender was aware that the children were scheduled to speak with the Commonwealth Attorney on September 25, 2020, to discuss whether they would testify at the trial and that the GAL would also be present to protect their interests. In the first call with his mother, on September 22, 2020, Allender acknowledged that T.A. was expected to testify and then stated in his side of the conversation:

> I don't think there is a requirement that [T.A.] cooperate with the Commonwealth if she doesn't want to. Nothing she can say that helps from my perspective. So, whatever she wants to do, and I don't want to interfere with her. But if she wants to not say anything, I feel that would be best.
> . . .
> I just, I just, want to let you be aware that she might need education in her rights as a witness to not say anything. I don't want to provoke anything or influence her but want her to know that she can say that.
> . . .
> Might be something to ask in front of [the GAL], does she have to do this? Can she decline?

In the second phone conversation with his mother, on September 24, 2020, Allender stated: "There's nothing obligating the kids to cooperate if they decide they don't want to, like a both ways. They should be aware of that right.

There's nothing that they can say to the prosecutors that helps me. Even if they say I'm completely innocent, prosecutors aren't looking for that."

In Allender's conversation with his father on September 25, 2020, Allender stated: "They, they, they [the children] have a right to say I don't want to talk. They can just consult with their attorney."

Allender moved for a directed verdict on all charges at the conclusion of the Commonwealth Attorney's case in chief and at the conclusion of all proof. Although Allender generally asked for a directed verdict on all charges, he only addressed specific reasons why the murder charge should receive a directed verdict at the conclusion of the Commonwealth Attorney's case in chief, and simply stated he would rest on his previous arguments when he asked for a directed verdict at the conclusion of all proof.

The trial court determined after Allender's first request that there was sufficient evidence for the charges to be decided by the jury, explaining "a juror could believe beyond a reasonable doubt under the evidence, assuming all the Commonwealth's evidence and all the fair and reasonable inferences from that evidence in favor of the Commonwealth could assume the defendant may be guilty of the charges." It concluded after his first request that the previous ruling was correct.

Kentucky Rules of Civil Procedure (CR) 50.01 requires a motion for directed verdict to "state the specific grounds therefor." Without a statement of the grounds on which directed verdict should be granted, the motion is not

36

preserved for appellate review. *Pate v. Commonwealth*, 134 S.W.3d 593, 597–98 (Ky. 2004).

In considering whether a motion for directed verdict should be granted, "[t]he trial court must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion, and a directed verdict should not be given unless the evidence is insufficient to sustain a conviction." *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983).

> If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

"When the denial of a properly preserved directed verdict motion is challenged on appeal, the standard of review is [] whether, viewing the evidence in the light most favorable to the Commonwealth, any rational juror could have found all the elements of the crime." *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 35 (Ky. 2011). However, when reviewing an insufficiently specific motion for directed verdict, like the one offered by Allender, we employ a palpable error standard of review in accordance with RCr 10.26. *Potts v. Commonwealth*, 172 S.W.3d 345, 348 (Ky. 2005).

Allender was convicted of tampering with a witness pursuant to KRS 524.050, which provides as follows:

(1) A person is guilty of tampering with a witness when, knowing that a person is or may be called as a witness in an official proceeding, he:

    (a) Induces or attempts to induce the witness to absent himself or otherwise avoid appearing or testifying at the official proceeding with intent to influence the outcome thereby; or

    (b) Knowingly makes any false statement or practices any fraud or deceit with intent to affect the testimony of the witness.

Although Allender argues he was only trying to ensure that the children understood their rights, his statements were capable of more than one interpretation. The Commonwealth Attorney clearly interpreted these statements as Allender's attempt to get his parents to take an action to prevent the children from testifying, thereby preventing them from saying anything which would hurt him. Allender did not need to specifically say, "keep the children from testifying against me so I do not get convicted," to properly be convicted for tampering, as the law does not require such an explicit statement for conviction.[3] There is also no requirement that the children ultimately be called to testify.

However, the statements Allender made were equivocal as his focus appeared to be on his children understanding their rights and not instructing them on what to do. These statements are also different because as a parent,

---

[3] In making such a determination, we are acting consistently with a previous unpublished decision which allowed for tampering to be inferred from other statements. *See Jacobs v. Commonwealth*, 2018-SC-000366-MR, 2020 WL 1847080, at *4, *19–20 (Ky. Mar. 26, 2020 (interpreting the suspect telling the lead officer who was investigating criminal charges against him that he had a video of the officer raping the suspect's wife, to support the inference that the suspect was attempting to get the officer to stop his investigation or to not testify before the grand jury).

38

even if he did not currently have custody over them, it was appropriate for Allender to have concern for his children when put in this difficult circumstance. We also have an additional layer of separation between Allender and the children as Allender was talking to his parents and not the children, and he expressed his concerns to them and his wish for the children to understand their rights, rather than specifically instructing that his parents or the children take a specific action.

Given these circumstances, palpable error was established because the jury could not properly find from the evidence that Allender was attempting to enlist his parents' aid in preventing the children who were in their custody from testifying with the intent to influence the outcome of the trial. Therefore, we reverse Allender's conviction and sentence for tampering with a witness.

### D. Cumulative error is not sufficient to merit this Court's reversal of the trial court's decision.

While errors were made regarding the admission of some evidence and a statement in closing argument as to the murder charge, they were relatively minor errors over the course of this lengthy trial considering all the evidence supporting the verdict. Considered together, they are not sufficient to establish cumulative error meriting reversal.

## III. CONCLUSION

We are confident that Allender received an appropriate if not perfect trial and was properly convicted of murder under the totality of the overwhelming evidence presented supporting such a verdict. Accordingly, we affirm

39

Allender's conviction and sentence for murder by the Campbell Circuit Court. However, as there was insufficient evidence on the tampering charge, we reverse and remand for a directed verdict to be granted in Allender's favor dismissing that conviction and sentence.

All sitting. VanMeter, C.J.; Bisig, Conley, Lambert, and Thompson, JJ., concur. Keller and Nickell, JJ., concur in result only.

COUNSEL FOR APPELLANT:

Karen Shuff Maurer
Emily Holt Rhorer
Assistant Public Advocates

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Joseph A. Beckett
Office of the Solicitor General